## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| DONNA DISSELKAMP and<br>ERICA HUNTER, individually and on<br>behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | COMPLAINT – CLASS ACTION |
| v. | ) ) | Civil Action No.  3:18-cv-48-CRS |
| NORTON HEALTHCARE, INC., RICHARD S.<br>WOLF, G. HUNT ROUNSAVALL, STEPHEN A.<br>WILLIAMS, DONALD H. ROBINSON, THE<br>NORTON HEALTHCARE RETIREMENT PLAN<br>INVESTMENT COMMITTEE, and JANE<br>AND/OR JOHN DOES 1-25 | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## COMPLAINT

COME NOW Plaintiffs Donna Disselkamp and Erica Hunter (hereinafter referred to as "Named Plaintiffs"), individually and as representatives of a class of participants and beneficiaries of the Norton Healthcare Defined Contribution Retirement Plan (hereinafter referred to as the "Plan"), and, pursuant to 29 U.S.C. § 1132(a)(2) and (3), state their complaint against Defendants, Norton Healthcare, Inc. (hereinafter referred to as "Norton Healthcare), each member of the Board of Directors of Norton Healthcare (hereinafter referred to as the "Board of Directors") from 2012 to the present, and the Norton Healthcare Retirement Plan Investment Committee ("Investment Committee"), for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended, (hereinafter referred to as "ERISA") 29 U.S.C. §§ 1001-1461, as follows:

## I.      PRELIMINARY STATEMENT

1.      Today, 26 U.S.C. § 401(k) and § 403(b) defined contribution plans, where employees bear the market risk and must pay the fees and expenses of the investment options, have become America's primary retirement system. This is the result of a gradual departure from the traditional, defined benefit (pension) plans, where the employer assumes the risks and pays the fees and expenses of the investments.[1]

2.      The marketplace for services for defined contribution plans is established and competitive. To compete for business from large plans, the financial industry makes new, lower-cost investment products available for these plans. Often, this includes new, less-expensive "share classes" of mutual funds. These lower share classes are, essentially, volume discounts made available to larger plans and, in some cases, even to retail customers.

3.      As ERISA fiduciaries to the Plan, Defendants are obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982). In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); *see also Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

4.      Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410,

---

[1]  Nancy Trejos, Retirement Wreck, Washington Post (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828–29 (2015).

5.     One of the most common and well-known examples of an imprudent investment is to purchase a more expensive share class of a mutual fund when a less expensive share class is available.[2] A prudent fiduciary does not make such an elementary mistake.

6.     For a large plan of $700 million in assets, such as the Norton Plan, there is no excuse for failing to continuously monitor the Plan's investment options to take advantage of share class discounts. In this case, nonetheless, Defendants repeatedly failed over the Class Period from 2012 to 2016 to monitor the share classes of mutual fund investments and to substitute less expensive share classes of mutual funds for more expensive ones. As a result, Defendants wasted the assets of the Plan participants, who were forced to pay higher fees than were necessary.

7.     To remedy these fiduciary breaches, Named Plaintiffs, Donna Disselkamp and Erica Hunter, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' misuse of Plan assets. Plaintiff also seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

---

[2] The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"); *see also* FINRA 2016 Regulatory and Examination Priorities Letter.

## II.    JURISDICTION AND VENUE

8.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

9.    This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## III.    PARTIES

**A.    The Norton Healthcare 403(b) Plan**

10.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34). The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a), which was amended and restated effective as of December 1, 2016.

11.    The Plan provides for retirement income for employees of Norton Healthcare and any direct or indirect subsidiary of the company that has been offered the Plan. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and from the performance of investment options, net of fees and expenses, exclusively controlled by the fiduciaries of the Plan.

12.    Norton Healthcare established a trust (hereinafter referred to as "Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the Trust,

in accordance with 29 U.S.C. § 1103. The Trust was established pursuant to a trust agreement ("Trust Agreement") between Norton Healthcare and the Plan's trustee, Delaware Charter Guarantee and Trust, *d/b/a* Principal Trust Company.[3]

13.     As of December 31, 2016, the Plan had more than $714 million in assets and more than 13,000 participants with account balances.[4]

## B.     Named Plaintiffs

14.     Plaintiff Donna Disselkamp resides in Louisville, Kentucky, and was a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan.

15.     Plaintiff Erica Hunter also resides in Louisville, Kentucky, and was a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan.

## C.     Defendants

16.     Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan.

17.     Defendant Norton Healthcare, Inc. is a not-for-profit organization organized under the laws of the Commonwealth of Kentucky with its principal place of business in Louisville, Kentucky. Norton Healthcare is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a).

---

[3] *See* Form 5500 Annual Return/Report of Employee Benefit Plan, filed with the U.S. Department of Labor, Employee Benefits Security Administration ("2016 Form 5500").
[4] *See Id.*

18.     Defendant Richard S. Wolf served on Norton Healthcare's Board of Directors from 2012 to 2017 and is a resident of Louisville, Kentucky. As a director, Mr. Wolf was an ERISA fiduciary and was responsible for ensuring that Plan expenses were reasonable.

19.     Defendant G. Hunt Rounsavall served on Norton Healthcare's Board of Directors from 2012 to 2017 and is a resident of Louisville, Kentucky. As a director, Mr. Rounsavall was an ERISA fiduciary and was responsible for ensuring that Plan expenses were reasonable.

20.     Defendant Stephen A. Williams served on Norton Healthcare's Board of Directors from 2012 to 2016 and is a resident of Louisville, Kentucky. As a director, Mr. Williams was an ERISA fiduciary and was responsible for ensuring that Plan expenses were reasonable.

21.     Defendant Donald H. Robinson served on Norton Healthcare's Board of Directors in 2017 and is a resident of Louisville, Kentucky. As a director, Mr. Robinson was an ERISA fiduciary and was responsible for ensuring that Plan expenses were reasonable.

22.     Upon information and belief, Defendant Investment Committee is comprised of employees of Norton Healthcare. This Committee has the authority to determine the investment funds made available under the Plan. Defendants Jane and John Does 1–25 are members of the Committee, executives in charge of Human Resources, or members of Norton Healthcare's Board of Directors during the Class Period, who are unknown to Plaintiff.

23.     Prior to the initial filing of this Complaint, Plaintiff Disselkamp requested information from the Plan Administrator pursuant to 29 U.S.C. § 1024, which requires, among other statutory production, furnishing documents or instruments under which the Plan is established or operated.  Despite its statutory obligation to respond to requests for information made by participants, Norton Healthcare, as Plan Administrator, failed and refused to comply with Plaintiff Disselkamp's request. Plaintiffs, without the benefit of this information, are not able to

6

identify all of the Defendants that breached their fiduciary duties in the manner set forth herein. Accordingly, all Defendants are collectively referred to herein as "Defendants."

## IV.   FACTS APPLICABLE TO ALL COUNTS

24.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which are determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34). Unreasonable fees and expenses can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees can result in large differences in the amount of savings available at retirement.[5]

25.    Defendants controlled the available investment options in which the participants could invest their retirement assets. In other words, Norton chose the options on the Plan's investment menu. Participants then selected investment options from the investment menu for their individual accounts. As of December 31, 2017, the Plan's menu of investment options included twenty mutual funds and one "stable value" fixed income option.[6]

### A.    Share Classes and the Cost of Mutual Funds

26.    It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees – expressed as a percentage of the amount invested or "expense ratio" – that can be obtained in the market. Thus, large

---

[5] *See, e.g.,* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, 1-2 (Aug. 2013) (illustrating impact of expenses with an example in which a 1% difference in fees and expenses over 35 years reduces a participant's account balance at retirement by 28%). This article is available at the following web address: http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.
[6] *See, e.g.,* 2016 Norton 403(b) Plan Form 5500.

retirement plans have substantial bargaining power to negotiate lower management fees for the same investment products.[7]

27.     There are, generally, two broad categories of mutual funds – retail and institutional. Retail class shares are available to a broad spectrum of investors, including individuals, while institutional class shares are typically only sold to larger investors, including 401(k) and 403(b) plans. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

28.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and obligations, such as different fee and load charges. Retail shares are commonly available in three different share classes: A, B, and C. Each class represents the same interest in the mutual fund's portfolio, but has different sales charges, fees, and expenses. For example, Class A shares often charge a front-end sales charge or "load" deducted from the total investment to pay the advisors' sales commissions.[8] Front-load discounts, called

---

[7] "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances' - such as the size of the plan - are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Investments*, Plan Sponsor Magazine (Jan. 2011)." Available at http://www.finra.org/investors/alerts/understanding-mutual-fund-classes.

[8] *See*, FINRA, *Understanding Mutual Fund Classes,* (October 6, 2008). This article is available at:

https://www.drinkerbiddle.com/-/media/files/insights/publications/2011/01/classifying-mutual-funds-the-duty-to-understand-/class-ifying-mutual-funds-the-duty-to-understand-mutual-fund-costs.pdf

"breakpoints," are usually available for larger purchases. Class B shares generally do not impose front-end sale charges, but often have higher operating expenses, but may impose a contingent deferred sales charge if the shares are redeemed before specified time periods. Class C shares, by contrast, have no front or back-end loads, but have higher operating expenses.[9]

29.     Retail share classes – Classes A, B, and C – are readily accessible to most retirement plans. Larger plans, however, have access to institutional share classes or I Share classes. These shares typically carry far lower costs and expense ratios than A, B and C Shares.  There also are advisor class shares, available only through investment advisors. Advisor class shares typically do not have an up-front charge, but are often subject to other distribution fees that increase the cost. Other share classes available to employer-sponsored plans include "R-Shares," which typically range from R-1 to R-6. The R-6 class, in particular, is designated to strip investment costs from distributions costs and other costs to provide a heightened level of fee transparency.[10]

30.     Retirement plans such as the Plan are able to take advantage of substantial volume discounts in purchasing mutual fund shares. Lower-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, like the Plan, that can easily meet minimum investment amounts for these share classes.[11]

31.     A manager of a $700 million retirement plan, acting prudently, must know the difference and select the lowest share class available. Failure to do so is a breach of fiduciary duty. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment

---

[9] *See*, *e.g.*, *Joint SEC/NASD/NYSE Report of Examinations of Broker-Dealers Regarding Discounts on Front-End Sales Charges on Mutual Funds*, NASD, NYSE, SEC (March 2003).
[10] *See*, *e.g.*, *Defined Contribution Plan Share Classes*, Eagle Asset Management (November 2016).
[11] *The New ABCs of Mutual Funds*, Wall Street Journal (June 2, 2013).

advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[12]

**B.      Fee Waste Resulting from Selecting Wrong Share Class of Mutual Funds**

32.      In this case, the fiduciaries to the Plan wasted the assets of the Plan by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the plan menu. Time after time, the fiduciaries to the plan, selected the wrong, that is, higher-cost share class of Plan investment options when the right, that is, lower-cost identical class was available and would have made the exact same investment product available to the participants. This failure continued from the beginning of the class period until the present, in some cases. It was not until 2014 that Norton began correcting the share-class problem, by substituting lower-cost, identical share classes of these mutual funds.

33.      The mutual funds for which Plaintiffs cannot currently determine the share class utilized also may have offered lower-cost share classes which would have been available to the Plan.

34.      The following are instances, summarized on the Chart attached as **Exhibit A,** in which Norton wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plan:

**Principal Income Equity R-5 (PEIQX)**

35.      In 2012 Norton invested $33,558,344 in the Principal Income Equity R-5 Fund ("PEIQX"). PEIQX's total operating expenses charged to the plan for 2012 amounted to .77% (77 basis points)[13] of total plan investment:

---

[12] OCIE, 2016 Share Class Initiative, *supra.*

[13] One basis point is equal to 1/100 of one percent. Thus, a 67 basis point fee equates to $6,700 per $1 million invested.

| Annual Fund Operating Expenses Equity Income Fund | Class R-1 | Class R-2 | Class R-3 | Class R-4 | Class R-5 |
|---|---|---|---|---|---|
| Management Fees | 0.51% | 0.51% | 0.51% | 0.51% | 0.51% |
| Distribution and/or Service (12b-1) Fees | 0.35% | 0.30% | 0.25% | 0.10% | |
| Other Expenses | 0.53% | 0.45% | 0.32% | 0.28% | 0.26% |
| Total Annual Fund Operating Expenses | 1.39% | 1.26% | 1.08% | 0.89% | 0.77% |

Figure A, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=898745&accession_number=0001144204-12-016190&xbrl_type=r

36.     In 2012 Principal also offered an identical Principal Equity Institutional Class Fund ("PEIIX"). PEIIX carried a total operating expense of .52% (52 basis points):

| Annual Fund Operating Expenses | Equity Income Fund Institutional Class |
|---|---|
| Management Fees | 0.51% |
| Other Expenses | 0.01% |
| Total Annual Fund Operating Expenses | 0.52% |

Figure B, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=898745&accession_number=0001144204-12-016190&xbrl_type=r

37.     The expense ratio difference was .25%, and, as a result, Plan participants unnecessarily overpaid $83,895.86 – .25% of $33,558,344 – in 2012.

38.     In 2013 Norton invested $46,955,568 in PEIQX, with a total operating expense of .77% (77 basis points):

| Equity Income Fund, Class R-3 Shares [Member] | Equity Income Fund, Class R-4 Shares [Member] | Equity Income Fund, Class R-5 Shares [Member] |
|---|---|---|
| 0.51% | 0.51% | 0.51% |
| 0.25% | 0.10% | |
| 0.32% | 0.28% | 0.26% |
| 1.08% | 0.89% | 0.77% |

Figure C, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=898745&accession_number=0000898745-13-000311&xbrl_type=r

39.    PEIIX carried a total operating expense of .52% (52 basis points):

| Annual Fund Operating Expenses | Equity Income Fund Institutional Class |
|---|---|
| Management Fees | 0.51% |
| Other Expenses | 0.01% |
| Total Annual Fund Operating Expenses | 0.52% |

Figure D, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=898745&accession_number=0001144204-12-016190&xbrl_type=r

40.    The expense ratio difference was .25%, and, as a result, Plan participants unnecessarily overpaid $117,389 – .25% of $46,955,568 – in 2013.

41.    In 2014 Norton invested $55,479,949 in PEIQX.   On information and belief, PEIQX's total operating expenses charged to the plan for 2014 amounted to .77% (77 basis points) of total plan investment.[14]

_____

[14] Principal misfiled certain information with the SEC.  Because of this, the information on record shows the wrong share class when either the PEIQX or PEIIX funds are searched.

12

42.     However, in 2014 Principal also offered an identical Principal Equity Institutional Class Fund ("PEIIX").

43.     On information and belief, in 2014 PEIIX carried a total operating expense of .52% (52 basis points).

44.     The expense ratio difference was .25%, and, as a result, Plan participants unnecessarily overpaid $138,700 – .25% of $55,479,949 – in 2014.

45.     In 2015 Norton switched the PEIQX shares into the PEIIX fund that had been available for the previous three years.

46.     Over this three-year period prior to 2015, plan participants were unnecessarily charged $339,984.65.

### American Funds Europacific Growth Fund A (AEPGX)

47.     In 2012 Norton invested $28,902,329 in the American Funds Europacific Growth Fund A ("AEPGX"). AEPGX's total operating expenses charged to the Plan for 2012 amounted to .84% (84 basis points) of total plan investment:

| Annual Fund Operating Expenses EUROPACIFIC GROWTH FUND | Class A | Class B | Class C | Class F-1 | Class F-2 |
|---|---|---|---|---|---|
| Management fees | 0.42% | 0.42% | 0.42% | 0.42% | 0.42% |
| Distribution and/or service (12b-1) fees | 0.24% | 1.00% | 1.00% | 0.25% | none |
| Other expenses | 0.18% | 0.16% | 0.20% | 0.19% | 0.16% |
| Total annual fund operating expenses | 0.84% | 1.58% | 1.62% | 0.86% | 0.58% |

Figure E, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=719603&accession_number=0001474365-12-000054&xbrl_type=r

48.     In 2012 American also offered an identical American Funds Europacific Growth R-6 fund ("RERGX").

49.     In 2012, RERGX carried a total operating expense of .50% (50 basis points):

| Class R-1 | Class R-2 | Class R-3 | Class R-4 | Class R-5 | Class R-6 |
|-----------|-----------|-----------|-----------|-----------|-----------|
| 0.42% | 0.42% | 0.42% | 0.42% | 0.42% | 0.42% |
| 1.00% | 0.75% | 0.50% | 0.25% | none | none |
| 0.19% | 0.45% | 0.22% | 0.18% | 0.13% | 0.08% |
| 1.61% | 1.62% | 1.14% | 0.85% | 0.55% | 0.50% |

Figure F, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=719603&accession_number=0001474365-12-000054&xbrl_type=r

50.   The expense ratio difference was .34%, and, as a result, Plan participants unnecessarily overpaid $98,268 – .34% of $28,902,329 – in 2012.

51.   In 2013 Norton invested $38,631,922 in the AEPGX.   AEPGX's total operating expenses charged to the Plan for 2013 amounted to .86% (86 basis points) of total plan investment:

| Annual Fund Operating Expenses EUROPACIFIC GROWTH FUND® | Class A | Class B | Class C | Class F-1 | Class F-2 |
|---|---|---|---|---|---|
| Management fees | 0.42% | 0.42% | 0.42% | 0.42% | 0.42% |
| Distribution and/or service (12b-1) fees | 0.24% | 1.00% | 1.00% | 0.25% | none |
| Other expenses | 0.20% | 0.17% | 0.21% | 0.18% | 0.17% |
| Total annual fund operating expenses | 0.86% | 1.59% | 1.63% | 0.85% | 0.59% |

Figure G, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=719603&accession_number=0000925950-13-000053&xbrl_type=r

52.   In 2013 American also offered an identical American Funds Europacific Growth R-6 fund ("RERGX").

53.   In 2013 RERGX carried a total operating expense of .50% (50 basis points):

| Class R-1 | Class R-2 | Class R-3 | Class R-4 | Class R-5 | Class R-6 |
|-----------|-----------|-----------|-----------|-----------|-----------|
| 0.42% | 0.42% | 0.42% | 0.42% | 0.42% | 0.42% |
| 1.00% | 0.74% | 0.50% | 0.25% | none | none |
| 0.19% | 0.44% | 0.22% | 0.18% | 0.13% | 0.08% |
| 1.61% | 1.60% | 1.14% | 0.85% | 0.55% | 0.50% |

Figure H, accessible without highlighting at:

https://www.sec.gov/cgi-
bin/viewer?action=view&cik=719603&accession_number=0000925950-13-
000053&xbrl_type=r

54.     The expense ratio difference was .36% and, as a result, Plan participants unnecessarily overpaid $139,074.92 – .36% of $38,631,922 – in 2013.

55.     In 2014 Norton invested $41,671,850 in the AEPGX.  AEPGX's total operating expenses charged to the Plan for 2014 amounted to .84% (84 basis points) of total plan investment:

| Annual Fund Operating Expenses EUROPACIFIC GROWTH FUND® | Class A | Class B | Class C | Class F-1 | Class F-2 |
|---|---|---|---|---|---|
| Management fees | 0.42% | 0.42% | 0.42% | 0.42% | 0.42% |
| Distribution and/or service (12b-1) fees | 0.24% | 1.00% | 1.00% | 0.25% | none |
| Other expenses | 0.18% | 0.16% | 0.20% | 0.20% | 0.17% |
| Total annual fund operating expenses | 0.84% | 1.58% | 1.62% | 0.87% | 0.59% |

Figure I, accessible without highlighting at:

https://www.sec.gov/cgi-
bin/viewer?action=view&cik=719603&accession_number=0000051931-14-
001006&xbrl_type=r

56.     However, in 2014 American also offered an identical American Funds Europacific Growth R-6 fund ("RERGX").

57.     In 2014 RERGX carried a total operating expense of .49% (49 basis points):

| Class R-3 | Class R-4 | Class R-5 | Class R-6 |
|-----------|-----------|-----------|-----------|
| 0.42% | 0.42% | 0.42% | 0.42% |
| 0.50% | 0.25% | none | none |
| 0.22% | 0.17% | 0.12% | 0.07% |
| 1.14% | 0.84% | 0.54% | 0.49% |

Figure J, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=719603&accession_number=0000051931-14-001006&xbrl_type=r

58.     The expense ratio difference was .34% and, as a result, Plan participants unnecessarily overpaid $141,684 – .34% of $41,671,850 – in 2014.

59.     In 2015 Norton switched the AEPGX fund shares into the RERGX fund that had been available for the previous three years.

60.     Over this three-year period prior to 2015, plan participants were unnecessarily charged an additional $379,027.

**Franklin Growth Advisor Class Fund (FCGAX)**

61.     In 2013 Norton invested $52,584,537 in the Franklin Growth Advisor Class Fund, which may be identified by its stock or "ticker symbol" ("FCGAX").  FCGAX's total operating expenses in this fund amount to .67% (67 basis points) of total plan investment.

62.     Beginning in 2013 Franklin began offering an identical Franklin Growth Fund R-6 class ("FIFRX").  FIFRX is identical to FCGAX, except for the cost. FIFRX carried a total operating expense of .49% (49 basis points):

| Annual Fund Operating Expenses Franklin Growth Fund | | Class A | Class C | Class R | Class R6 | Advisor Class |
|---|---|---|---|---|---|---|
| Management Fees (as a percentage of Assets) | | 0.46% | 0.46% | 0.46% | 0.46% | 0.46% |
| Distribution and Service (12b-1) Fees | | 0.25% | 1.00% | 0.50% | none | none |
| Other Expenses (as a percentage of Assets): | [1] | 0.21% | 0.21% | 0.21% | 0.03% | 0.21% |
| Acquired Fund Fees and Expenses | [2] | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% |
| Expenses (as a percentage of Assets) | | 0.93% | 1.68% | 1.18% | 0.50% | 0.68% |
| Fee Waiver or Reimbursement | [3] | (0.01%) | (0.01%) | (0.01%) | (0.01%) | (0.01%) |
| Net Expenses (as a percentage of Assets) | [2] | 0.92% | 1.67% | 1.17% | 0.49% | 0.67% |

Figure K, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=38721&accession_number=0001379491-14-000129&xbrl_type=r

63.     The expense ratio difference was .18% and, as a result, Plan participants unnecessarily overpaid $94,652 – .18% of the $52,584,537 investment – in 2013.

64.     In 2014 Norton invested $61,727,391 in FCGAX, with a total operating expense of .65% (65 basis points).  FIFRX carried a total operating expense of .47% (47 basis points):

| Annual Operating Expenses Franklin Custodian Funds-14 Franklin Growth Fund | Class A | Class C | Class R | Class R6 | Advisor Class |
|---|---|---|---|---|---|
| Management fees | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% |
| Distribution and service (12b-1) fees | 0.25% | 1.00% | 0.50% | none | none |
| Other expenses | 0.20% | 0.20% | 0.20% | 0.02% | 0.20% |
| Total annual Fund operating expenses | 0.90% | 1.65% | 1.15% | 0.47% | 0.65% |

Figure L, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=38721&accession_number=0001379491-15-000120&xbrl_type=r

65.     The expense ratio difference was .18%, and, as a result, Plan participants unnecessarily overpaid $111,109 – .18% of the $61,727,391 investment – in 2014.

66.     In 2015 Norton invested $65,747,342 in FCGAX, with a total operating expense of .63% (63 basis points).  FIFRX carried a total operating expense of .46% (46 basis points):

| Annual Operating Expenses {- Franklin Growth Fund} - Franklin Custodian Funds-15 - Franklin Growth Fund | Class A | Class C | Class R | Class R6 | Advisor Class |
|---|---|---|---|---|---|
| Management fees | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% |
| Distribution and service (12b-1) fees | 0.25% | 1.00% | 0.50% | none | none |
| Other expenses | 0.18% | 0.18% | 0.18% | 0.01% | 0.18% |
| Total annual Fund operating expenses | 0.88% | 1.63% | 1.13% | 0.46% | 0.63% |

Figure M, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=38721&accession_number=0001379491-16-002357&xbrl_type=r

67.     The expense ratio difference again was .18%, and, as a result, the Plan participants unnecessarily overpaid $111,770 – .18% of $65,747,342 – in 2015.

68.     In 2016 Norton invested $75,225,407 in FCGAX, with a total operating expense of .63% (63 basis points).  FIFRX carried a total operating expense of .48% (48 basis points):

| Annual Operating Expenses {- Franklin Growth Fund} - Franklin Custodian Funds-15 - Franklin Growth Fund | Class A | Class C | Class R | Class R6 | Advisor Class |
|---|---|---|---|---|---|
| Management fees | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% |
| Distribution and service (12b-1) fees | 0.25% | 1.00% | 0.50% | none | none |
| Other expenses | 0.18% | 0.18% | 0.18% | 0.01% | 0.18% |
| Total annual Fund operating expenses | 0.88% | 1.63% | 1.13% | 0.46% | 0.63% |

Figure N, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=38721&accession_number=0001379491-16-002357&xbrl_type=r

69.     The expense ratio difference was .18%, and, as a result, Plan participants unnecessarily overpaid $127,883 – .18% of $75,225,407 – in 2016.

70.     Between 2013 and 2016, plan participants were unnecessarily charged $445,415 in this share class alone.

## Columbia Acorn A (LACAX)

71.     In 2012 Norton invested $15,146,462 in the Columbia Acorn A Fund ("LACAX").

72.     However, in 2012 American also offered an identical Columbia Acorn Class Y Fund ("CRBYX").

73.     LACAX's total operating expenses charged to the Plan for 2012 amounted to 1.10% (110 basis points) of total plan investment.  In 2012 CRBYX carried a total operating expense of .72% (72 basis points):

| Annual Fund Operating Expenses (Columbia Acorn Fund) | Class A Shares | Class B Shares | Class C Shares | Class I Shares | Class R4 Shares | Class R5 Shares | Class Y Shares | Class Z Shares |
|---|---|---|---|---|---|---|---|---|
| Management fees | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% |
| Distribution and/or service (Rule 12b-1) fees | 0.25% | 0.75% | 1.00% | none | none | none | none | none |
| Other expenses [1] | 0.21% | 0.33% | 0.17% | 0.08% | 0.28% | 0.13% | 0.08% | 0.18% |
| Total annual Fund operating expenses | 1.10% | 1.72% | 1.81% | 0.72% | 0.92% | 0.77% | 0.72% | 0.82% |

Figure O, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=2110&accession_number=0001193125-13-231479&xbrl_type=r

74.     The expense ratio difference was .38%, and, as a result, Plan participants unnecessarily overpaid $57,556.56 – .38% of $15,146,462 – in 2012.

75.     In 2013 Norton invested $20,664,000 in LACAX.   LACAX's total operating expenses charged to the Plan for 2013 amounted to .110% (110 basis points):

| Annual Fund Operating Expenses (Columbia Acorn Fund) | Class A Shares | Class B Shares | Class C Shares |
|---|---|---|---|
| Management fees | 0.64% | 0.64% | 0.64% |
| Distribution and/or service (Rule 12b-1) fees | 0.25% | 0.75% | 1.00% |
| Other expenses [1] | 0.21% | 0.33% | 0.17% |
| Total annual Fund operating expenses | 1.10% | 1.72% | 1.81% |

Figure P, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=2110&accession_number=0001193125-13-231479&xbrl_type=r

76.     In 2013 CRBYX carried a total operating expense of .72% (72 basis points):

| Class R4 Shares | Class R5 Shares | Class Y Shares | Class Z Shares |
|---|---|---|---|
| 0.64% | 0.64% | 0.64% | 0.64% |
| none | none | none | none |
| 0.28% | 0.13% | 0.08% | 0.18% |
| 0.92% | 0.77% | 0.72% | 0.82% |

Figure Q, accessible without highlighting at:

 https://www.sec.gov/cgi-bin/viewer?action=view&cik=2110&accession_number=0001193125-13-231479&xbrl_type=r

77.     The expense ratio difference was .38% and, as a result, Plan participants unnecessarily overpaid $78,523.20 – .38% of $20,664,000 – in 2013.

78.     In 2014 Norton pulled all but $15,698.00 from LACAX.

79.     Over this two-year period prior to 2014, plan participants were unnecessarily overcharged an additional $136,080.

**JP Morgan Mid Capital Value Select (JMVSX)**

80.     In 2012 Norton invested $15,009,347 in the JP Morgan Mid Capital Value Select Fund ("JMVSX").  JMVSX's total operating expenses charged to the Plan for 2012 amounted to 1.00% (100 basis points) of total plan investment:

| Annual Fund Operating Expenses A, B, C, Select Shares JPMorgan Mid Cap Value Fund | | Class A | Class B | Class C | Select Class |
|---|---|---|---|---|---|
| Management Fees | | 0.65% | 0.65% | 0.65% | 0.65% |
| Distribution (Rule 12b-1) Fees | | 0.25% | 0.75% | 0.75% | none |
| Other Expenses | | 0.51% | 0.51% | 0.51% | 0.51% |
| Shareholder Service Fees | | 0.25% | 0.25% | 0.25% | 0.25% |
| Remainder of Other Expenses | | 0.26% | 0.26% | 0.26% | 0.26% |
| Acquired Fund Fees and Expenses | | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | | 1.42% | 1.92% | 1.92% | 1.17% |
| Fee Waivers and Expense Reimbursements | [1] | (0.17%) | (0.16%) | (0.16%) | (0.17%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 1.25% | 1.76% | 1.76% | 1.00% |

Figure R, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=2110&accession_number=0001193125-13-231479&xbrl_type=r

81.     However, in 2012 JP Morgan also offered an identical JP Morgan Mid Cap Value Fund Class L ("FLMVX").  In 2012 FLMVX carried a total operating expense of .76% (76 basis points):

| Annual Fund Operating Expenses | | Institutional Shares JPMorgan Mid Cap Value Fund Institutional Class |
|---|---|---|
| Management Fees | | 0.65% |
| Distribution (Rule 12b-1) Fees | | none |
| Other Expenses | | 0.36% |
| Shareholder Service Fees | | 0.10% |
| Remainder of Other Expenses | | 0.26% |
| Acquired Fund Fees and Expenses | | 0.01% |
| Total Annual Fund Operating Expenses | | 1.02% |
| Fee Waivers and Expense Reimbursements | [1] | (0.26%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 0.76% |

Figure S, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=1037897&accession_number=0001193125-12-453591&xbrl_type=r

82.    The expense ratio difference was .24% and, as a result, Plan participants unnecessarily overpaid $36,022 – .24% of $15,009,347 – in 2012.

83.    In 2013 Norton invested $21,114,758 in JMVSX.   JMVSX's total operating expenses charged to the Plan for 2013 amounted to 1.00% (100 basis points) of total plan investment:

| Annual Fund Operating Expenses A, B, C, Select Shares JPMorgan Mid Cap Value Fund | | Class A | Class B | Class C | Select Class |
|---|---|---|---|---|---|
| Management Fees | | 0.65% | 0.65% | 0.65% | 0.65% |
| Distribution (Rule 12b-1) Fees | | 0.25% | 0.75% | 0.75% | none |
| Other Expenses | | 0.48% | 0.48% | 0.48% | 0.48% |
| Shareholder Service Fees | | 0.25% | 0.25% | 0.25% | 0.25% |
| Remainder of Other Expenses | | 0.23% | 0.23% | 0.23% | 0.23% |
| Acquired Fund Fees and Expenses | | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | | 1.39% | 1.89% | 1.89% | 1.14% |
| Fee Waivers and Expense Reimbursements | *[1]* | (0.14%) | (0.13%) | (0.13%) | (0.14%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | *[1]* | 1.25% | 1.76% | 1.76% | 1.00% |

Figure T, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=1037897&accession_number=0001193125-12-453591&xbrl_type=r

84.     However, in 2013 JP Morgan also offered the identical fund FLMVX.  In 2013

FLMVX2 carried a total operating expense of .76% (76 basis points):

| Annual Fund Operating Expenses | | Institutional Shares JPMorgan Mid Cap Value Fund Institutional Class |
|---|---|---|
| Management Fees | | 0.65% |
| Distribution (Rule 12b-1) Fees | | none |
| Other Expenses | | 0.33% |
| Shareholder Service Fees | | 0.10% |
| Remainder of Other Expenses | | 0.23% |
| Acquired Fund Fees and Expenses | | 0.01% |
| Total Annual Fund Operating Expenses | | 0.99% |
| Fee Waivers and Expense Reimbursements | [1] | (0.23%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 0.76% |

Figure U, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=1037897&accession_number=0001193125-12-453591&xbrl_type=r

85.     The expense ratio difference was .24% and, as a result, Plan participants unnecessarily overpaid $50,675.42 – .24% of $21,114,758 – in 2013.

86.     In 2014 Norton invested $24,303,721.00 in JMVSX. JMVSX's total operating expenses charged to the Plan for 2014 amounted to 1.00% (100 basis points) of total plan investment.

87.     However, in 2014 JP Morgan also offered the identical fund FLMVX.  In 2014 FLMVX2 carried a total operating expense of .76% (76 basis points):

| Annual Fund Operating Expenses | | Institutional Shares JPMorgan Mid Cap Value Fund Institutional Class |
|---|---|---|
| Management Fees | | 0.65% |
| Distribution (Rule 12b-1) Fees | | none |
| Other Expenses | | 0.36% |
| Shareholder Service Fees | | 0.10% |
| Remainder of Other Expenses | | 0.26% |
| Acquired Fund Fees and Expenses | | 0.01% |
| Total Annual Fund Operating Expenses | | 1.02% |
| Fee Waivers and Expense Reimbursements | [1] | (0.26%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 0.76% |

Figure V, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=1037897&accession_number=0001193125-12-453591&xbrl_type=r

88.    The expense ratio difference was .24% and, as a result, Plan participants unnecessarily overpaid $58,329 – .24% of $24,303,721 – in 2014.

89.    In 2015 Norton switched their investments in JMVSX to FLMVX.

90.    Over this three-year period prior to 2015, plan participants were unnecessarily charged an additional $145,027.

**AllianzGI: NFJ Small Capital Value (PCVAX)**

91.    In 2013 Norton invested $20,962,416 in the AllianzGI: NFJ Small Capital Value Fund ("PCVAX").  PCVAX's total operating expenses charged to the Plan for 2013 amounted to 1.21% (121 basis points) of total plan investment:

| Annual Fund Operating Expenses Class A, Class B, Class C, Class R AllianzGI NFJ Small-Cap Value Fund | A | B | C | R |
|---|---|---|---|---|
| Management Fees | 0.95% | 0.95% | 0.95% | 0.95% |
| Distribution and/or Service (12b-1) Fees | 0.25% | 1.00% | 1.00% | 0.50% |
| Other Expenses | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | 1.21% | 1.96% | 1.96% | 1.46% |

Figure W, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=867297&accession_number=0001104659-13-070404&xbrl_type=r

92.    However, in 2013, AllianzGI offered an identical product called the AllianzGI NFJ Small-Cap Value Fund R6 ("ANFVX"). ANFVX's total operating expenses charged to the Plan for 2013 amounted to .77% (77 basis points) of total plan investment:

| Annual Fund Operating Expenses | | AllianzGI NFJ Small-Cap Value Fund R6 |
|---|---|---|
| Management Fees | | 0.80% |
| Distribution and/or Service (12b-1) Fees | | none |
| Other Expenses | | 0.01% |
| Total Annual Fund Operating Expenses | | 0.81% |
| Expense Reductions | [1] | (0.04%) |
| Total Annual Fund Operating Expenses After Expense Reductions | [1] | 0.77% |

Figure X, accessible without highlighting at:

 https://www.sec.gov/cgi-bin/viewer?action=view&cik=867297&accession_number=0001104659-13-091459&xbrl_type=r

93.    The expense ratio difference was .44% and, as a result, Plan participants unnecessarily overpaid $92,235 – .44% of $20,962,416 – in 2013.

94.    In 2014 Norton invested $21,783,084 in PCVAX.   PCVAX's total operating expenses charged to the Plan for 2014 amounted to 1.21% (121 basis points) of total plan investment:

| Annual Fund Operating Expenses Class A, Class B, Class C, Class R AllianzGI NFJ Small-Cap Value Fund | A | B | C | R |
|---|---|---|---|---|
| Management Fees | 0.95% | 0.95% | 0.95% | 0.95% |
| Distribution and/or Service (12b-1) Fees | 0.25% | 1.00% | 1.00% | 0.50% |
| Other Expenses | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | 1.21% | 1.96% | 1.96% | 1.46% |

Figure Y, accessible without highlighting at:

 https://www.sec.gov/cgi-bin/viewer?action=view&cik=867297&accession_number=0001104659-14-066499&xbrl_type=r

95.    In 2014 ANFVX's total operating expenses charged to the Plan for 2014 amounted to .81% (81 basis points) of total plan investment:

| Annual Fund Operating Expenses AllianzGI NFJ Small-Cap Value Fund | A | B | C | R | Institutional | R6 |
|---|---|---|---|---|---|---|
| Management Fees | 0.95% | 0.95% | 0.95% | 0.95% | 0.85% | 0.80% |
| Distribution and/or Service (12b-1) Fees | 0.25% | 1.00% | 1.00% | 0.50% | none | none |
| Other Expenses | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | 1.21% | 1.96% | 1.96% | 1.46% | 0.86% | 0.81% |

Figure Z, accessible without highlighting at:

https://www.sec.gov/cgi-bin/viewer?action=view&cik=867297&accession_number=0001104659-14-066499&xbrl_type=r

96.    The expense ratio difference was .40% and, as a result, Plan participants unnecessarily overpaid $87,132.34 – .40% of $21,783,084 – in 2014.

97.    In 2015 Norton moved all of their investments in AllianzGI into other funds.

98.     Over this two-year period prior to 2015, plan participants unnecessarily overpaid $179,367.

99.     There were a number of other funds – including the Goldman Growth Opportunities Fund, Newberger Berman Socially Resp. Funds, American Century Real Estate Fund, Eagle Small Capital Growth Fund, JP Morgan Core Bond R5, Oppenheimer Developing Markets Fund, and Deutsche Real Estate Fund – for which Defendants selected the wrong share class.  (*See* Exhibit A).

100.    As shown on the Chart attached as **Exhibit A**, Defendants systematically failed to uphold their fiduciary duties to the Plan by causing the Plan to purchase more expensive share classes of mutual funds when less expensive classes of the funds were available. This resulted in plan participants paying unnecessary, excessive fees in the amount of approximately two million dollars ($2,000,000).

101.    In addition the participants to the Plan not only lost the amounts unnecessarily wasted on fees, but also the investment returns they would have earned had these amounts remained invested in the Plan. Over a six-year period, this has resulted in an additional .5 million dollars ($500,000) loss to the Plan.

### ERISA FIDUCIARY STANDARDS

102.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

103.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

104.    Under ERISA fiduciaries that exercise any authority or control over plan assets, including the selection of share classes of plan investments, must act prudently and solely in the interest of participants in the plan.

105.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single to the interests of participants."  *Chao v. USA Mining Inc*., 2007 U.S. Dist. LEXIS 5598, *36, (E.D. Tenn. Jan. 24, 2007) (citing to *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995)); *Bierwith*, 680 F.2d at 271, 272 n.8.

106.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

107.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

108.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

109.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the plan, as an alternative to direct individual action on behalf of the plan under 29 U.S.C. § 1132(a)(2) and (3), plaintiff may seek to certify a class action on behalf of all participants and beneficiaries of the plan. Named Plaintiffs seek to certify, and to be appointed as representatives of the following class:

> All participants and beneficiaries of the Norton Health Care Retirement Plan from January 1, 2012, through the date of judgment, excluding the defendants.

110.    This action meets the requirements of *Fed. R. Civ. P.*, Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class will have several thousand members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took actions and omissions alleged herein as to the Plan, and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation:

(i)      who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

(ii)     whether the fiduciaries of the Plan breached their fiduciary duties to the Plan;

(iii)    what are the losses to the Plan resulting from each breach of fiduciary duty; and

(iv)    what Plan-wide equitable and other relief should the Court impose in light of Defendants' breach of duty.

c.      Named Plaintiffs claims are typical of the claims of the Class because Named Plaintiffs were participants during the time-period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Named Plaintiffs are adequate representatives of the Class because they were participants in the Plan, have no interests in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C.

§ 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under *Fed. R. Civ. P.,* Rule 23(b)(1)(A) or (B).

111.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action.  Alternatively, then, this action may be certified as a class action under *Fed. R. Civ. P.* Rule 23(b)(3) if it is not certified under Rule 23(b)(1(A) or (B).

112.    Plaintiff's counsel, Bishop Korus Friend, P.S.C., James White Firm, LLC, Tomlinson Law, LLC, and Johnston Law Firm, P.C., will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under *Fed. R. Civ. P.* Rule 23(g).

## COUNT I

### Breach of Duties of Loyalty and Prudence - Unreasonable Investment Management Fees

113.    Named Plaintiffs restate and incorporate herein by reference the preceding allegations of this Complaint.

114.     This Count alleges breach of fiduciary duties against the Defendants.

115.     The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

116.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S.Ct. at 1829.

117.     Defendants selected and retained as Plan investment options mutual funds with the wrong share class – that is, Defendants selected a higher, more expensive share class of certain mutual funds, when a lower, less-expensive share class of the very same mutual fund was available. In so doing, Defendants breached their fiduciary duty to the Plan by wasting the assets of the Plan. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

118.     Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B).

119.     Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

120.     Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of each of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II

### Failure to Monitor Fiduciaries

121.     Named Plaintiffs restate and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth here.

122.     This Count alleges breach of fiduciary duties against the Defendants.

123.     Norton Healthcare is responsible for the appointment of the Investment Committee to serve as Plan Administrator, with sole responsibility for the administration of the Plan. The Board of Directors is responsible for appointing and removing members of the Investment Committee.

124.     Given that Norton Healthcare had explicit fiduciary responsibility to appoint the Investment Committee, and the Board of Directors had explicit fiduciary responsibility to appoint

34

and remove members of the Investment Committee, Norton, the Board of Directors and its individual members had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Investment Committee.

125.    An on-going monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

126.    To the extent any of Norton Healthcare's or the Board of Directors' fiduciary responsibilities were delegated to another fiduciary, Norton's and the Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

127.    Defendants breached their fiduciary ongoing monitoring duties by, among other things:

a.    Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.    Failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options, including lower-cost share classes of the identical mutual funds, that charged far lower fees than the Plan's mutual fund options; and

     d.     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, and excessive-cost investments, all to the detriment of Plan participants' retirement savings.

128.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Named Plaintiffs, and the other Class members, lost millions of dollars in their retirement savings.

129.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

130.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## JURY TRIAL DEMANDED

131.    Pursuant to *Fed. R. Civ. P.* Rule 38 and the Constitution of the United States, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, demands a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Named Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

(A)    Find and declare that the Defendants have breached their fiduciary duties as described above;

(B)    Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

(C)    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

(D)    Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

(E)    Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

(F)    Certify the Class, appoint Named Plaintiffs, Donna Disselkamp and Erica Hunter, as class representatives, and appoint Bishop Korus Friend, PSC, Tomlinson Law, LLC, James White Firm, LLC, and Johnston Law Firm, P.C.  as Class Counsel;

(G)    Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(H)    Order the payment of interest to the extent it is allowed by law; and

(J)    Grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted,

*/s/ John S. Friend*
John S. Friend
Robert W. "Joe" Bishop
Tyler Z. Korus
Bishop Korus Friend, PSC
6520 Glenridge Park Place, Suite 6
Louisville, Kentucky 40222
(502) 425-2600
firm@bishoplegal.net

Frank H. Tomlinson
Tomlinson Law, LLC
2100 First Avenue North, Suite 600
Birmingham, Alabama 35203
(205) 326-6626
hilton@tomlawllc.com
*Subject to Pro Hac Vice Admission Motion*

James H. White, IV
James White Firm, LLC
2100 First Avenue North, Suite 600
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com
*Subject to Pro Hac Vice Admission Motion*

Brice M. Johnston
Johnston Law Firm, P.C.
2100 First Avenue North, Suite 600
 Birmingham, Alabama 35203
 (205 328-9445 Ext. 600
brice@johnstonfirmpc.com
*Subject to Pro Hac Vice Admission Motion*

Counsel for Plaintiffs