UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00048-GNS

DONNA DISSELKAMP, et al.                                                    PLAINTIFFS

v.

NORTON HEALTHCARE, INC., et al.                                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions to Dismiss (DN 19, 31, 32), and

Plaintiffs' Motion for Leave to File Sur-Reply (DN 54). The motions are ripe for adjudication.

For the reasons outlined below, Defendants' Motions to Dismiss (DN 31, 32) are **GRANTED IN**

**PART** and **DENIED IN PART**, and the other motions are **DENIED**.

## I.      STATEMENT OF CLAIMS

This is an action brought under the Employee Retirement Income and Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 *et seq.*, concerning the administration of Defendant Norton

Healthcare, Inc.'s ("Norton") 403(b) Retirement Savings Plan ("the Plan"). (Am. Compl. ¶ 14,

DN 20). The Plan is a defined contribution, individual account, pension benefit plan as defined

under 29 U.S.C. §§ 1002(2)(A) and 1002(34). (Am. Compl. ¶ 14). Named Plaintiffs Donna

Disselkamp, Erica Hunter, Sey Momodou Bah, Kathy Reed, and Curtis Cornett ("Plaintiffs") were

participants in the Plan during the alleged class period. (Am. Compl. ¶¶ 18-22).

Norton is the Plan Administrator and a named fiduciary. (Am. Compl. ¶ 25). Plaintiffs

allege Defendants Richard Wolf, G. Hunt Rounsavall, Stephen A. Williams, and Donald H.

Robinson were members of Norton's Board of Directors from 2012-2017. (Am. Compl. ¶¶ 26-

29). These named individual Defendants were also members of the Norton Healthcare Retirement

Plan Investment Committee ("Retirement Committee") and as such were ERISA fiduciaries responsible for ensuring that plan expenses were reasonable and that plan funds were invested prudently and loyally. (Am. Compl. ¶¶ 26-29). There are presently twenty-five additional unnamed Defendants whom Plaintiffs believe comprise the remainder of the Retirement Committee. (Am. Compl. ¶ 30). When appropriate, the Court will refer to Norton, the Retirement Committee and the individually named Defendants collectively as "Norton Defendants."

Defendant Lockton Investment Advisors, LLC is affiliated with Lockton Financial Advisors, LLC and Lockton Companies, LLC (jointly "Lockton Defendants"). Lockton Defendants offer licensed broker-dealers and insurance agents to sell securities, insurance products, and insurance consulting services. (Am. Compl. ¶ 31).

After the lawsuit was filed, Norton Defendants moved to dismiss the claims asserted against them. (Defs.' Mot. Dismiss, DN 19). Subsequently, Plaintiffs amended the Complaint. In the Amended Complaint, Plaintiffs assert seven counts against Defendants alleging various breaches of fiduciary duty. (Am. Compl. ¶¶ 204-82). Norton Defendants have moved to dismiss Counts I, II, III, IV, VI, and VII, and Lockton Defendants have joined in this motion. (Defs.' Mot. Dismiss Am. Compl., DN 32). Lockton Defendants have separately moved to dismiss Count V. (Lockton Defs.' Mot. Dismiss, DN 31 [hereinafter Lockton's Mot.]).

## II.    JURISDICTION

This case presents a federal question, and jurisdiction is therefore proper under 28 U.S.C. § 1331.

## III.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and is subject to dismissal if it "fail[s] to state a claim upon which relief can

be granted." Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed pursuant to Rule 12(b)(6) if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561-64).

## IV.     DISCUSSION

### A.     Defendants' Motion to Dismiss Complaint (DN 19)

Norton Defendants have moved to dismiss the claims asserted against them in the Complaint. (Defs.' Mot. Dismiss, DN 19). Because the Amended Complaint subsumes the

allegations in the original Complaint, the Court will deny this motion as moot. *See Herran Props., LLC v. Lyon Cty. Fiscal Court*, No. 5:17-CV-00107-GNS, 2017 WL 6377984, at *2 (citing *Cedar View, Ltd. v. Colpetzer*, No. 5:05-CV-00782, 2006 WL 456482, at *5 (N.D. Ohio Feb. 24, 2006)); *Ky. Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 857 (E.D. Ky. 2005) (citing *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000)).

**B.**      **Defendants' Motions to Dismiss Amended Complaint (DN 31, 32)**

Following the filing of the Amended Complaint, Defendants moved to dismiss the claims asserted against them. Each claim will be addressed below.

**1.**      *Background and Overview*

Before 2012, Norton provided its employees retirement benefits in the form of a "bundled plan" administered by Transamerica Life Insurance and its affiliates. (Am. Compl. 35). The term "bundled plan" means Norton purchased a pre-packaged platform where custody, record keeping, and investments were provided in an integrated platform. (Am. Compl. ¶ 35).

In 2012, Norton restructured the Plan, which is now funded under a group annuity contract and a trust arrangement. (Am. Compl. ¶¶ 16, 36). Norton established a trust with Delaware Charter Guarantee and Trust, doing business as Principal Trust. (Am. Compl. ¶ 16). Norton also established a group annuity contract with Principal Life Insurance ("Principal Life").[1] The alleged class period concerns only Plan decisions made after the restructuring.

Lockton Defendants provided advice to Norton Defendants with respect to its restructure of the Plan. (Am. Compl. ¶ 37). Plaintiffs allege Lockton Defendants advised Norton Defendants on matters including but not limited to the following: the selection and compensation of service

---

[1] Where appropriate, the Court will refer to Principal Trust and Principal Life collectively as "Principal."

providers; initial plan and vendor analysis; investment selection and monitoring; fiduciary and compliance services; employee communication and education; mergers; and acquisitions and divestitures. (Am. Compl. ¶ 37). Lockton Defendants continued advising Norton after the restructuring as well. (Am. Compl. ¶ 37).

2. ***Count I: Breach of the Duty of Prudence for Failing to Employ Viable Methodology for Selecting and Monitoring Investment Options***

Plaintiffs' claims regarding Defendants' breach of the duty of prudence can be separated into two categories: Defendants' selection of and failure to replace higher cost share classes when identical shares with lower costs were available, and Defendants' selection of and failure to replace the Principal Fixed Income Option as its sole stable value fund. Because Defendants' motion first addresses the share class issue, the Court will begin its analysis there.

a. **Selection of Share Classes**

According to the Amended Complaint, a general principle of investment management holds that investors with greater assets enjoy greater bargaining power when negotiating management fees because the more assets they possess, the lower the management fees will be when expressed as a percentage of the overall portfolio. (Am. Compl. ¶ 83). The two most common classes of mutual funds are retail funds and institutional funds. (Am. Compl. ¶ 84). Retail funds are available to a broad spectrum of investors, including individuals, whereas institutional funds, as their names suggests, are generally only available to larger investors including 401(k) and 403(b) plans. (Am. Compl. ¶ 84). Institutional funds typically charge lower expense ratios than similarly situated retail mutual funds. (Am. Compl. ¶ 84).

As there are different classes of mutual funds, there are also different share classes of a single mutual fund. (Am. Compl. ¶¶ 85, 87). Retail share classes possess different shareholder rights and responsibilities from institutional class shares, which are also called "R Class shares."

(Am. Compl. ¶ 87). These may include differing fee and load charges. (Am. Compl. ¶¶ 85, 87). But while the fees differ, the assets underlying the various share classes as well as their management and investment styles are identical. (Am. Compl. ¶ 85).

Plaintiffs state that a prudent fiduciary should have in place a methodology for taking advantage of discounts available through the purchase of institutional shares. (Am. Compl. ¶ 90). Because mutual funds are not static, it is important for a prudent fiduciary to monitor the Plan in the event lower cost share classes become available. (Am. Compl. ¶ 91). Plaintiffs contend Norton violated its duty of prudence by failing to monitor the availability of lower cost share classes, and in so doing subjected Plan participants to higher-than-necessary expenses. (Am. Compl. ¶¶ 92-93). Further, Plaintiffs contend Norton began correcting the problem by substituting lower cost share classes in 2015. (Am. Compl. ¶ 93).

To exemplify Plaintiffs' allegations, they allege that in 2012 Norton offered a mutual fund known as the Principal Equity R-5 Fund ("PEIQX"). (Am. Compl. ¶ 96). The PEIQX fund offered a total expense ratio of 0.77%.[2] (Am. Compl. ¶ 96). At the same time, Norton offered an identical product of a different share class, the Principal Equity Institutional Class Fund ("PEIIX") with an expense ratio of 0.52%, 0.25% lower than PEIQX. (Am. Compl. ¶¶ 97-98). Plaintiffs argue because the Plan invested $33,558,344 in the PEIQX, the 0.25% difference in fees resulted in Plan participants paying $83,896 in additional fees for a different class share of the exact same product. (Am. Compl. ¶ 98).

In 2013, the expense ratios were the same as the previous year for both the PEIQX and the PEIIX respectively. (Am. Compl. ¶¶ 99-100). That year, Norton invested $46,955,568 in the

---

[2] Plaintiffs sometimes refer to these percentages in terms of basis points. One basis point is equal to 0.01%. (Am. Compl. 36 n.18). For purposes of consistency, the Court will use only percentages.

PEIQX, an amount Plaintiffs allege resulted in Plan participants paying an extra $117,389. (Am. Compl. ¶ 101). In 2014, Plaintiffs contend Norton invested $55,479,949 in the PEIQX, bringing the alleged overpayment to $138,700 before it switched the PEIQX funds to the PEIIX in 2015. (Am. Compl. ¶¶ 102-06).

Plaintiffs offer identical allegations about a number of other funds, with differences only in the precise expense ratios and resultant damages. (Am. Compl. ¶¶ 108-65). In total, Plaintiffs contend the Plan fiduciaries subjected participants to more than $2 million in unnecessary overpayments. (Am. Compl. ¶ 166). Plaintiffs additionally contend that they lost the money they would have made by investing the overpayments, bringing their total damages to around $3.3 million. (Am. Compl. ¶ 168).

Defendants now seek dismissal of this claim, arguing Plaintiffs have failed to assert specific facts that could lead to a conclusion that Norton Defendants acted imprudently. (Defs.' Mot. Dismiss Am. Compl. 7) Defendants contend Plaintiffs criticize investment decisions based solely on results viewed with 20/20 hindsight and fail to identify any specific flaw in Defendants' methodology. (Defs.' Mot. Dismiss Am. Compl. 7-9). Further, Defendants maintain the Amended Complaint supports a conclusion that Defendants acted prudently by responding to and correcting certain problems well before this lawsuit. (Defs.' Mot. Dismiss Am. Compl. 8-9). Specifically, Defendants argue that the Complaint acknowledges that Defendants substituted some higher cost share classes for lower cost institutional options in 2015, and this action supports a conclusion that Defendants acted prudently by monitoring the Plan. (Defs.' Mot. Dismiss Am. Compl. 9).

To state a claim for breach of the duty of prudence, a plaintiff must allege (1) that the defendants were fiduciaries of the plan; (2) that the defendants' acts or omissions amounted to a breach of duty; and (3) that harm resulted from the breach. *Pegram v. Herdrich*, 530 U.S. 211,

225-26 (2000). "An ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (*Tibble I*) (quoting 29 U.S.C. § 1104(a)(1)(B)). A fiduciary must act "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1)(A). The statute codifies the common law duties of loyalty and prudence, and these duties are "the highest known to the law." *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005).

"Prudence is measured according to the objective 'prudent person' standard developed in the common law of trusts." *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)). A fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble I*, 135 S. Ct. at 1828-29. The test for whether a fiduciary has violated the duty of prudence asks whether the fiduciary employed appropriate methods for investigating the merits of the investment and the investment structure, judged at the time of the challenged transaction. *Pfeil v. State Street Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015). Focus should be placed on whether the fiduciary engaged in reasonable decision-making consistent with a prudent person acting in a similar capacity. *Id.*

Norton Defendants do not dispute that they are fiduciaries of the Plan, and Plaintiffs have alleged damages. Therefore, the issue centers on the second prong of the test, and the Court must ask whether Defendants' failure to purchase institutional class mutual funds would constitute a breach of the duty of prudence if proven.[3]

---

[3] Lockton Defendants contest their status as Fiduciary to the Plan, but the Court does not address that challenge here.

Courts examining this issue have concluded that investment in a retail class fund where an identical institutional class fund with lower fees is available can violate the duty of prudence. *Tibble v. Edison Int'l*, No. CV 07-5359 SVW (AGRx), 2010 WL 2757153, at *26 (N.D. Cal. July 8, 2010) (*Tibble II*), *vacated on other grounds by Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. 2016) (*Tibble III*). In *Tibble II*, following a bench trial, the District Court for the Northern District of California held that a plan fiduciary's inability to present any evidence at trial that it conducted an investigation before purchasing a retail class mutual fund when an identical institutional class fund was available with lower fees violated the duty of prudence. *Id.* That is precisely what Plaintiffs have alleged occurred in this case. *See also Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559 (D. Minn. 2014).

Most notably, the Court in *Tibble II* treated the issue of whether the defendants had violated their fiduciary duties as a factual issue to be resolved at trial. "To determine whether the decision to invest in retail share classes constitutes a breach of the duty of prudence, the Court must examine whether the fiduciaries engaged in a thorough investigation of the merits of the investment at the time the funds were added to the Plan." *Tibble II*, 2010 WL 2757153, at *25 (citations omitted). Thus, Plaintiffs' claim that Defendants failed to investigate lower cost options is not a fact couched as a legal conclusion which should be stricken when considering a motion to dismiss. Rather, it is a statement of fact that the Court will accept as true for purposes of this 12(b)(6) motion.

Further, the Court in *Tibble* II noted that plan administrators switched to lower cost institutional funds upon a subsequent review of plan investments. *Id.* at *26. The same occurred here, but Defendants urge the Court not to consider this action lest it might dissuade future plan administrators from replacing poorly performing investments for fear doing so might support a claim of imprudence. (Defs.' Mot. Dismiss Am. Compl. 9). This argument has no merit, however,

because here the Court is not ruling on the merits of the claim but only assessing whether Plaintiffs are entitled to proceed to discovery.

Finally, Defendants argue this claim must be dismissed because Defendants applied the higher fees collected from the retail class funds to pay administrative fees through revenue-sharing. (Defs.' Mot. Dismiss Am. Compl. 11-13). Again, however, this is an argument not suited for a decision on a motion to dismiss. The Court does not know the precise effect of revenue-sharing on all of the funds Plaintiffs allege are affected. Additionally, while the revenue-sharing argument may eventually mitigate liability and damages, it still remains to be seen whether Defendants prudently investigated the higher share class investments before subjecting Plan participants to those higher fees. Therefore, Defendants' motion to dismiss Count I with respect to the Plan's methodology for selecting and monitoring share classes is denied.

### b. The Plan's Selection and Monitoring of Its Stable Value Fund

Plaintiffs allege Defendants breached their fiduciary duty of prudence with their selection of Stable Value Accounts ("SVA"). An SVA is a contract, not a mutual fund investment. (Am. Compl. ¶ 42). SVAs are similar to money market funds because they offer individual investors both liquidity and principal protection. (Am. Compl. ¶ 42). At the same time, SVAs are similar to bond funds because they offer consistent returns over time. (Am. Compl. ¶ 42). They differ from both, however, because an SVA seeks to offer greater returns than a money market fund while being less volatile than a bond fund. (Am. Compl. ¶ 42).

In the 2012 restructuring of the Plan, Norton replaced the SVA offered by Transamerica with the Principal Guaranteed Fixed Income Option offered by Principal. (Am. Compl. ¶ 41). A fixed annuity contract governs the terms and conditions of the Principal Fixed Income Option, a type of contract commonly known as a Guaranteed Investment Contract ("GIC") under which

Principal guarantees investors a certain return. (Am. Compl. ¶ 43). The Plan owns the contract but not the actual investments, which reside in Principal's general account. As a result, those assets would be available to Principal's creditors in the event Principal became insolvent. (Am. Compl. ¶ 43).

The Principal Fixed Income Option is a proprietary product, meaning it is owned by the plan service provider or one of its affiliates. (Am. Compl. ¶ 44). Plaintiffs point out that an issue that may arise with proprietary products is that they are selected not based on their merits but instead because of the relationship between the plan and the service provider. (Am. Compl. ¶ 44). Proprietary products may create conflicts because the service provider has an incentive to provide products which generate extra revenue in preference to non-proprietary products. (Am. Compl. ¶ 44). These conflicts may deepen if an investment advisor receives a commission when the Plan adopts a proprietary product because it incentivizes the advisor to make preferential recommendations based on the advisor's personal financial interest. (Am. Compl. ¶ 44).

The Principal Fixed Income Option is classified as a short-term fixed income asset. (Am. Compl. ¶ 45). Annual participant disclosures reveal that it is in fact the only option available to plan participants in this class, and more than 15% of the Plan's assets are invested in this option. (Am. Compl. ¶¶ 45, 46). Therefore, participants wishing to invest in what is considered one of the least risky investments have no choice other than the Principal Fixed Income Option. (Am. Compl. ¶ 45).

Plaintiffs contend part of the Plan's duty of prudence requires knowledge of, among other things, the credit risk qualities of various Stable Value options and their investment performance. (Am. Compl. ¶ 47). From a credit risk perspective, there are three categories of stable value products: general account products, separate account products, and synthetic products. (Am.

Compl. ¶ 48). The Principal Fixed Income Option is a general account product. (Am. Compl. ¶ 49). As mentioned above, the Plan does not own the assets of the fund, which are placed in the insurance company's general account. Thus, should Principal become insolvent, the Plan could only recover to the extent assets from Principal's general accounts are available—i.e., as an unsecured creditor. (Am. Compl. ¶ 49).

The 1980s and 1990s saw several high-profile insolvencies of stable value providers. (Am. Compl. ¶ 50). Following these events, many 401(k) fiduciaries stopped using general account products for their SVAs. (Am. Compl. ¶ 51). Some invested in money market funds, while others who sought higher yields began investing in separate account contracts for their stable value products. (Am. Compl. ¶ 51).

The separate account contract, as its name suggests, requires the insurer to create a segregated account to support the contract. (Am. Compl. ¶ 52). The separate account comprises a combination of fixed income securities and, like the general account product, offers principal preservation and a specified return. (Am. Compl. ¶ 52). As with general account products, the participants do not own the funds being invested, but because the insurance company keeps the Plan's investment in a segregated account, there is some limited protection against creditors. (Am. Compl. ¶ 52). Namely, unlike general account assets, the segregated account is not subject to the insurer's general creditors. (Am. Compl. ¶ 52). To a limited extent, this diversifies the single entity credit risk inherent to general account products. (Am. Compl. ¶ 52).

Continuing the movement away from general account products, many large 401(k) providers began using synthetic stable value products in the wake of the 2008 credit crises. (Am. Compl. ¶¶ 53, 56). A synthetic stable value fund is a diversified portfolio of fixed income securities and is insulated from interest rate volatilities through wrap contracts with insurers. (Am.

Compl. ¶ 53). Unlike general account and separate account products, however, with a synthetic stable value product, the plan participants actually own the underlying assets. (Am. Compl. ¶ 53). Plaintiffs contend that most large 401(k) and 403(b) plans have at this point divested themselves of general account and separate account products in favor of synthetic GICs. (Am. Compl. ¶¶ 55-56).

Moreover, Plaintiffs point out that general account products create uncertainty as to management fees. (Am. Compl. ¶¶ 58-59). This is because the retirement plan owns only a contract rather than the underlying assets. (Am. Compl. ¶ 58). With respect to the Principal Fixed Income Option, Principal does not disclose a Rate Level Service Fee disclosure. (Am. Compl. ¶ 58). Plaintiffs contend this leaves plan sponsors to compare investment returns with other SVAs, and an SVA should be removed from the Plan if other insurance carriers offer a higher rate. (Am. Compl. ¶ 58).

Plaintiffs maintain Defendants "failed to implement a prudent methodology for selecting, monitoring, and replacing the Principal stable value product and, where appropriate, diversifying into other, less-risky stable value products, based upon the risks, costs, and returns of other readily available investment products." (Am. Compl. ¶ 63). Plaintiffs claim Defendants should have but did not implement a methodology that considers factors such as the risk of general account products, the product's performance following the credit crisis, the return to participants, the amount of plan assets exposed to general credit risk, the cost of the product, and the benefit to Principal from the use of this proprietary product. (Am. Compl. ¶ 63).

Next, Plaintiffs assert Plan participants were unnecessarily exposed to single entity credit risk. (Am. Compl. ¶ 66). Plaintiffs contend Defendants could have easily offered a more

diversified selection of short-term fixed income options, particularly given the fact that such a substantial portion of plan assets were invested in this product. (Am. Compl. ¶ 66).

Plaintiffs further aver the Plan's fiduciaries failed to evaluate the nature, performance, and cost of the product. (Am. Compl. ¶ 67). As an example, a prudent investor would have compared the Principal Fixed Income Option's returns with those of one of Principal's major competitors such as TIAA-CREF. (Am. Compl. ¶ 67). Performing such a comparison would have revealed that the Principal product "essentially went into free fall following the 2008 credit crisis." (Am. Compl. ¶ 68). Plaintiffs point out that TIAA-CREF holds an A++ rating while Principal holds an A+ rating. (Am. Compl. ¶ 67). As a result, Plaintiffs argue that Principal should have offered a higher return to account for the higher credit risk. (Am. Compl. ¶ 67).

Additionally, given that an SVA's performance is guaranteed from the outset, a plan fiduciary knows from the date of selection what the product's returns will be. (Am. Compl. ¶ 81). Since SVAs are designed to be stable, a product that is underperforming can be expected to continue to underperform at around the same level. (Am. Compl. ¶ 81). Thus, Plaintiffs contend, had fiduciaries of the Plan monitored the Principal Fixed Income Option in appropriate six-month intervals they would have seen that the product was consistently underperforming and elected to replace it. (Am. Compl. ¶ 82).

Plaintiffs note that returns on general account products are not directly linked with the underlying assets supporting the contract but instead are tied to the performance of the insurer's general fund as a whole. (Am. Compl. ¶ 60). This results in the insurance company earning a profit, termed "the spread," when the assets supporting the contract with a retirement plan outperform the overall general fund. (Am. Compl. ¶ 60). Plaintiffs state that a prudent fiduciary

must monitor the spread, and this process may require the fiduciary to seek additional information from the insurance company and in some instances state regulators. (Am. Compl. ¶ 61).

Plaintiffs allege Defendants failed to monitor the amount of profit Principal was earning from the spread. (Am. Compl. ¶ 69). This failure was particularly impactful in this instance because Principal was also the recordkeeper. (Am. Compl. ¶ 70). Defendants should have, but did not, account for the spread when calculating Principal's compensation for recordkeeping, Plaintiffs contend. (Am. Compl. ¶ 70).

Next, Plaintiffs assert that Defendants had a duty to educate Plan participants about general account products' single entity credit risk and failed to do so. (Am. Compl. ¶ 71). Instead, Defendants stated in their brochure that the product "'is supported by the multi-billion dollar general account of Principal Life, which invests in private market bonds, commercial mortgages and mortgage-backed securities.'" (Am. Compl. ¶ 71). Plaintiffs argue that this may be true in a "hypertechnical sense," but the reality is the Principal Fixed Income Option is backed only by a piece of paper. (Am. Compl. ¶ 71).

Defendants now move for dismissal on three grounds: (1) Plaintiffs fail to state a claim by pointing out that Principal's A+ credit rating is slightly lower than some other SVAs; (2) Plaintiffs fail to state a claim by highlighting the Principal SVA's below average performance from 2012-2016; and (3) Plaintiffs fail to state a claim by alleging that the Principal SVA is an unreasonable risk because it is a general account product. (Defs.' Mot. Dismiss Am. Compl. 13). Plaintiffs' allegations are subject to the same test regarding the duty of prudence as the share class allegations discussed above. Defendants have excised three separate issues that it contends individually fail to state a claim for breach of the duty of prudence. The problem, however, is that complaints "'should be read as a whole, not parsed piece by piece to determine whether each allegation, in

isolation, is plausible.'" *Game Sci., Inc. v. Gamestation, Inc.*, No. 4:14CV-00044-JHM-HBB, 2014 WL 12726643, at *13 (W.D. Ky. Oct. 21, 2014) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).

Further, both Plaintiffs and Defendants have submitted exhibits and engaged in detailed arguments concerning comparative credit ratings for the funds. (*See, e.g.*, Defs.' Mot. Dismiss Am. Compl. 13; Pls.' Resp. Defs.' Mot. Dismiss Am. Compl. 14-22, DN 38 [hereinafter Pls.' Resp.]). A motion to dismiss is not, however, the appropriate vehicle for arguments regarding the truth of Plaintiffs' allegations or the accuracy of their statements. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001); *Beshwate v. BMW of N. Am., LLC*, No. 1:17-cv-00417-SAB, 2017 WL 6344451, at *17 (C.D. Cal. Dec. 12, 2017). The Court will therefore not attempt to resolve these issues at this juncture.

Neither party has identified—nor has the Court located—a case with allegations paralleling Plaintiffs' claims with regard to the Principal Fixed Income Option. The crux of Plaintiffs' argument again appears to be that the Plan fiduciaries failed to employ a prudent methodology in selecting the Plan's stable value fund. Defendants correctly point out that any attempt by Plaintiffs to rely on hindsight to prove this breach is improper. *Pfeil*, 806 F.3d at 386; *DeBruyne v. Equitable Life Assurance Soc'y*, 720 F. Supp. 1342, 1349 (N.D. Ill. 1989). However, Plaintiffs have alleged a failure to employ a prudent methodology and comparisons with better performing SVAs may be reasonably interpreted as a demonstration of a breach of care.

Plaintiffs note a defining feature of a stable value fund is its stability. (Am. Compl. ¶ 81). It is reasonable to conclude that if a predictable investment continues to chronically underperform, one could draw a conclusion that the fiduciaries overseeing that fund have breached their duty. In order to state a claim, a complaint need not detail the fiduciaries' direct knowledge, methods, or

investigations during the relevant times, so long as the inference can be reasonably be drawn from the surrounding factual circumstances that the decision-making process was flawed. *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013).

The Court concludes Plaintiffs have stated a claim. As a result, Defendants' motion will be denied with respect to Plaintiffs' claim regarding the selection and monitoring of the stable value fund.

### 3. *Count II: Excessive Administrative Fees*

Count II is divisible into separate claims for a violation of the duty of prudence, and a violation of the duty of loyalty. Both claims will be addressed separately.

#### a. **Duty of Prudence**

Plaintiffs challenge the monitoring and recordkeeping fees charged under the Plan. Plaintiffs contend that, in general, the actual cost to the Plan of keeping records depends on the number of participants, not the amount invested in the Plan. (Am. Compl. ¶ 170). Therefore, prudent fiduciaries do not negotiate recordkeeping fees as a percentage of plan assets. (Am. Compl. ¶ 171).

Selecting a recordkeeper should involve a competitive bidding process, and fiduciaries should learn not only the recordkeeper's cost per participant, but also the number of the recordkeeper's proprietary investment products in which the plan would be required to invest. (Am. Compl. ¶ 173). Part of the selection process should also involve a practice known as benchmarking, where fiduciaries compare a plan's present fee structure with those of competitors. (Am. Compl. ¶ 174). Moreover, Plaintiffs assert a prudent fiduciary should engage in a competitive bidding process approximately every three years. (Am. Compl. ¶ 175).

Plaintiffs allege, based on information presently available, a reasonable cost for recordkeeping in 2012 for the Plan would have been $50 per participant. (Am. Compl. ¶ 176). The actual cost, based on Plaintiffs' estimate, was in excess of $70. (Am. Compl. ¶ 178). Had Norton engaged in a competitive bidding process, it would have become apparent that a more cost-effective option was available and because Principal was the recordkeeper a competitive bidding process could have further served to offset the alleged losses caused by the Plan's use of Principal's SVA. (Am. Compl. ¶ 177).

In addition to Plaintiffs' challenge to Defendants' reliance on asset-based payments for recordkeeping, Plaintiffs contest the Plan's payment of administrative fees through revenue sharing. (Am. Compl. ¶ 180). Instead of paying Principal's recordkeeping fees directly from Participants' accounts, Norton deducted the fees from the expense ratios of the Plan's mutual fund investments. (Am. Compl. ¶ 180).

According to Plaintiffs, the use of revenue sharing to pay administrative fees becomes a problem when the assets of a plan grow rapidly. (Am. Compl. ¶ 183). Plaintiffs argue the Plan in this case exhibited rapid growth, and Norton failed to employ a prudent methodology to ensure Principal did not receive excessive compensation. (Am. Compl. ¶¶ 183-84). Further, Plaintiffs claim Norton's use of Principal's proprietary products resulted in an unfair boon to Principal. (Am. Compl. ¶¶ 184-87). Finally, Plaintiffs allege that Norton's use of an asset-based system for compensating the recordkeeper drove the decision to select higher share classes. (Am. Compl. ¶¶ 187-90).

Failure to engage in a competitive bidding process with respect to plan administrative fees may in some circumstances violate a fiduciary's duty of prudence. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011). Plaintiffs may demonstrate this through expert testimony.

*Id.* at 798-99. Because of the context-sensitive nature of such inquiries, claims of unreasonable fees often turn on questions of fact that cannot be determined on a motion to dismiss. *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1065 (M.D. Tenn. 2018) (citing *White v. Chevron*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016)).

Defendants argue Plaintiffs have failed to state a claim for breach of the duties of prudence and loyalty with respect to the Plan's administrative fees. (Defs.' Mot. Dismiss Am. Compl. 17). First, Defendants contend Plaintiffs admit that Norton engaged in a competitive bidding process in 2012 when it restructured the Plan, so that Plaintiffs cannot claim Norton failed to engage in a competitive bidding process. (Defs.' Mot. Dismiss Am. Compl. 17). As previously noted, however, Plaintiffs asserted that a prudent fiduciary should engage in this process every three years. Defendants do not mention whether a competitive bidding process occurred in 2015, three years after the restructuring, nor do they refute Plaintiffs' claim that every three years is an appropriate interval for seeking bids. The Court will therefore reject this argument.

Disregarding Defendants' argument concerning competitive bidding undercuts their next point: without a claim for failure to engage in competitive bidding, Defendants contend Plaintiffs can only claim that they should have collected fees via an asset-based system rather than through revenue-sharing. (Defs.' Mot. Dismiss Am. Compl. 17-18). Because the Court finds Plaintiffs alleged a cognizable failure to engage in a competitive bidding process, Defendants' contention is without merit.

Next, Defendants argue Plaintiffs are asserting that Norton had a duty to find the lowest administrative fees available. (Defs.' Mot. Dismiss Am. Compl. 18-19). Plaintiffs make no such assertion. Rather, as outlined above, Plaintiffs allege that the average per participant fee during

the relevant period was around $50, whereas the per participant fee for the Norton Plan was around $70. This is sufficient to survive a motion to dismiss. *Cassell*, 285 F. Supp.3d at 1064.

### b. Duty of Loyalty

ERISA's duty of loyalty requires that a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the exclusive purpose of (1) providing benefits to participants and their beneficiaries and (2) defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). To state a claim for breach of the duty of loyalty, a plaintiff must do more than merely reincorporate alleged breaches of the duty of prudence as disloyal acts. *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (KBF), 2017 WL 3701482 at *5 (S.D.N.Y. Aug. 25, 2017). "Rather, a plaintiff must allege facts that permit a plausible inference that the defendant engaged in transactions involving self-dealing or in transactions that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Cassell*, 285 F. Supp. 3d at 1062 (quoting *Sacerdote*, 2017 WL 3701482, at *5).

Review of the Amended Complaint discloses that the disloyalty claim asserted in this count is merely derivative of the imprudence claim discussed above. Nowhere do Plaintiffs allege that the Plan's fiduciaries were engaged in self-dealing with respect to the administrative fees. Plaintiffs argue in their response that both Lockton Defendants and Norton Defendants appear to deny responsibility for managing the fees and interactions with third parties, and this uncertainty creates a factual question as to whether the Plan was administered loyally. (Pls.' Resp. 28). This allegation does not appear in the Amended Complaint, however, and is therefore not well taken. But even if it were, the Amended Complaint nonetheless fails to allege facts sufficient to support a claimed breach of the duty of loyalty. The allegations do not support an inference that Norton

was engaged in self-dealing or otherwise violating the duty of loyalty. *Cassell*, 235 F. Supp. 3d at 1061-62. This portion of Count II will therefore be dismissed.

### 4. *Count III: Failure to Diversify*

Plaintiffs further argue Defendants violated their duty to diversify because they offered no other short-term fixed income option besides the Principal product. (Am. Compl. ¶¶ 72-75). Distilled, the argument is that no prudent fiduciary with a sound methodology could have analyzed the range of short-term fixed income products available to a plan as large as Norton's and selected the Principal Fixed Income Option. (Am. Compl. ¶ 75).

According to Plaintiffs, Norton also directed money to the Principal SVA through allocations made to Qualified Default Investment Alternatives ("QDIA(s)"), which are investment plans created for retirement contributions made by plan participants who do not specify investment instructions. (Am. Compl. ¶ 76). The Department of Labor has rejected the idea of using an SVA as a stand-alone QDIA, though an SVA may be part of a QDIA. (Am. Compl. ¶ 76). Instead, a QDIA must be diversified, may not directly contain securities in the company that employs the participant, and may not carry a penalty for early withdrawal. (Am. Compl. ¶ 76).

Defendants offered an automatic asset allocation service provided by Principal known as RetireView. (Am. Compl. ¶ 77). Plaintiffs allege that nearly every QDIA included the Principal product for its SVA. (Am. Compl. ¶ 77). Plaintiffs describe Defendants' actions as "effectively funneling the assets of the Plan participants into an insufficiently diversified stable value option." (Am. Compl. ¶ 78). Further, the Principal product consistently underperformed, returning 100 basis points lower than higher rated insurance carriers reflecting Defendants' alleged failure to monitor and replace the underperforming investment option. (Am. Compl. ¶ 80).

An ERISA fiduciary has a duty to diversify a plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]" 29 U.S.C. § 1104 (a)(1)(C). A fiduciary "'should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on the success of one enterprise.'" *Yates v. Nichols*, 286 F. Supp. 3d 854, 862 (N.D. Ohio 2017) (quoting *Bruner v. Boatmen's Tr. Co.*, 918 F. Supp. 1347, 1353 (E.D. Mo. 1996)).

Defendants argue that Plaintiffs cannot state a claim because they allege only that the Principal SVA was not diversified, not that the Plan as a whole was not diversified. (Defs.' Mot. Dismiss Am. Compl. 21). Defendants offer two primary citations supporting proposition. First, in *Harmon v. FMC Corp.*, No. 16-6073, 2018 WL 1366621, (E.D. Pa. Mar. 16, 2018), the District Court held that ERISA does not contemplate diversification claims based on the failure to diversify a single fund. *Id.* at *4. In *Harmon*, however, the Court was addressing a challenge to one of five long-term mutual funds that was allegedly insufficiently diversified. *Id.* at *1. By contrast, the SVA being challenged in this case represents the sole fixed-income option for Plan participants. Apart from this factual distinction, the Court notes that *Harmon* is an unpublished District Court opinion resting its holding on an unpublished Second Circuit opinion. *Id.* at *4 (citing *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)).

Thus, there are both factual distinctions from cited authority as well as questions of law at issue which have not yet been addressed in the Sixth Circuit. The Court therefore concludes dismissal would be inappropriate at this point.

### 5.    *Count IV:  Failure to Monitor*

Defendants next argue Plaintiffs' failure to monitor claim should be dismissed on the premise that if the Court accepts that Plaintiffs have failed to state a claim with respect to the

counts previously discussed, then there can be no breach of fiduciary duty and thus no failure to monitor. (Defs.' Mot. Dismiss Am. Compl. 22-23). As the Court has rejected Defendants' previous arguments and found that, in all but one circumstance, Plaintiffs have stated a claim, this argument loses its basis.

Defendants further assert that all of Plaintiffs' allegations concerning the failure to monitor are conclusory and therefore should be stricken. (Defs.' Mot. Dismiss Am. Compl. 23). Plaintiffs, however, need not directly assert actions by Defendants that demonstrate their failure to monitor to survive a motion to dismiss, so long as the Court can plausibly conclude from the surrounding factual circumstances that a violation occurred. *Pension Ben. Guar. Corp.*, 712 F.3d at 718. For reasons discussed in detail above, Plaintiffs have alleged numerous instances of Defendants' failure to monitor Plan assets. These include Norton's failure to monitor which share classes Plan assets were invested in, Norton's failure to monitor the performance of the Principal Fixed Income Option, and Norton's failure to monitor the spread on the Principal Fixed Income Option. The Court therefore concludes Plaintiffs have alleged sufficient facts which, when taken as a whole, state a claim for breach of the duty to monitor.

### 6.    *Count VII:  Failure to Supply Requested Information*

"The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Plan fiduciaries need not disclose information that is not included within ERISA's statutory guidelines. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) (en banc) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed

disclosure provisions do not require to be disclosed." (citations omitted)). However, this duty does carry a negative obligation that fiduciaries not misinform as well as an affirmative obligation to inform where silence may be harmful. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 452 (6th Cir. 2002).

Plaintiffs allege that Defendants violated their affirmative duty: specifically, that the Plan fiduciaries had a duty to inform participants of the risk of the Principal Fixed Income Option and failed to do so. (Am. Compl. ¶ 71). Plaintiffs further allege that the Plan did not disclose specific documents required by 29 U.S.C. § 1024(b)(4), but fail to identify these documents. Ordinarily this would merit dismissal of the claim. *Taylor v. KeyCorp*, 678 F. Supp. 2d 633, 641-42 (N.D. Ohio 2009). However, because Plaintiffs further allege inaccurate or incomplete information, the Court concludes Count VII states a claim and will therefore not be dismissed.

### 7.    *The Class Period*

Defendants allege that, if Plaintiffs have stated a claim, ERISA's three-year statute of limitations nonetheless precludes any claim for actions before January 22, 2015. (Defs.' Mot. Dismiss Am. Compl. 24-26). ERISA requires a plaintiff to bring suit no more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . ." 29 U.S.C. § 1113(2). In the Sixth Circuit, actual knowledge does not require that a plan participant know that the fiduciaries' actions amount to a cognizable claim under ERISA. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 548 (6th Cir. 2012); *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003). Rather, the inquiry is when the information that constitutes the alleged breach became known to plan participants, and it is not required that the plaintiff has seen or read the documents containing the alleged wrongdoing. *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010).

Defendants allege that Plan documents disclosed the expense ratios, and it was apparent that a portion of those expenses were going to pay Plan fees. (Defs.' Mot. Dismiss Am. Compl. 23). Notably, Defendants cite generally to a Plan document attached as Exhibit 4 but do not offer a precise page where such allegations are confirmed. Exhibit 4 is ninety-seven pages, and conclusory statements about such a fact-driven inquiry are unpersuasive. The Court will not attempt to divine the class period at this time, though Defendants may raise the argument again in the summary judgment context. *See Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830 (S.D. Ohio 2018).

In *Bernaola*, the court was addressing a mixed motion to dismiss and motion for summary judgment. *Id.* at 833. The court *sua sponte* converted a portion of the defendant's motion to dismiss to one for summary judgment and allowed discovery to go forward on the limited issue of when the plaintiffs had actual knowledge of the alleged harm. *Id.* at 836. This Court concludes that, given its rulings on the remainder of Defendants' motion, no need exists for a similar limitation on discovery. However, the Court makes no conclusions regarding the class period, and Defendants may raise the argument again at a later time.

### 8.    *Plaintiffs' Jury Demand*

Defendants move to strike Plaintiffs' demand for a jury trial. (Defs.' Mot. Dismiss Am. Compl. 26). In the Sixth Circuit, ERISA is considered a suit in equity, so there is no associated right to a trial by jury. *Reese v. CNH Am. LLC*, 574 F.3d 315, 327 (6th Cir. 2009); *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 882-83 (6th Cir. 1997); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 660-63 (6th Cir. 1996).

Plaintiffs argue *Great-West Life & Annuity Co. v. Knudson*, 534 U.S. 204 (2002), merits reconsideration of this precedent. (Pls.' Resp. 39). The Sixth Circuit has specifically disavowed this notion:

> *Knudson*, first and foremost, is not a Seventh Amendment case. It dealt with whether an action "seek[ing] . . . to impose personal liability . . . for a contractual obligation to pay money-relief" falls within § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which authorizes suits for "appropriate equitable relief." *See Knudson*, 534 U.S. at 209-10, 122 S. Ct. 708. The Court's conclusion—that such claims were not covered by § 502(a)(3) because they were legal in nature, not equitable, *see id.* at 210, 220-21, 122 S. Ct. 708—does not undermine our prior decisions. *Golden*, for example, acknowledged that "a monetary award, generally, is a form of legal relief," 73 F.3d at 661, before concluding that in health-care benefits cases like this one, any backward-looking relief is at best "incidental" in comparison to the primary goal of ensuring injunctive access to health-care benefits in the future, *id. Knudson*, by contrast, did not involve forward-looking relief but only "reimbursement . . . for past medical treatment," 534 U.S. at 208-09, 122 S. Ct. 708, leaving the Court no opportunity to say, much less hold, anything that would lead us to second guess *Golden*.

*Reese*, 574 F.3d at 327.

Plaintiffs seek to "restore the Plan to the position it would have occupied but for the breaches of fiduciary duty . . . ." (Am. Compl. 85). This prayer contemplates not only remedies in the form of damages, but potential prospective injunctive relief as well. *See also Howard v. Prudential Ins. Co. of Am.*, 248 F. Supp. 3d 862, 868 (W.D. Ky. 2017). The Court will therefore grant Defendants' motion to strike Plaintiffs' jury demand.

### 9.     *Count V:  Lockton Defendants' Fiduciary Breaches as Plans' Investment Adviser*

Lockton Defendants have separately moved to dismiss Count V of the Amended Complaint. Plaintiffs allege Lockton Defendants have served as the Plan's primary investment advisor since 2012. (Am. Compl. ¶ 31). According to Plaintiffs, Lockton Defendants are a fiduciary to the Plan because they rendered investment advice for a fee. (Am. Compl. ¶ 31 (citing 29 U.S.C. § 1002(21)(A)(ii)).

It is this alleged fiduciary relationship that is the center of Lockton Defendants' motion. Lockton Defendants urge the Court to examine only its service agreement with Norton, but the Sixth Circuit has made it clear that fiduciary relationships are not an all-or-nothing proposition. *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006). Instead, the Sixth Circuit employs a functional test in determining whether an individual is acting as a fiduciary capacity. *Id*. (citing *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001)). As a result, courts look to the conduct at issue. *Id.*

In this case, the terms of the service agreement cited by Lockton Defendants are not the final measure of its fiduciary status. The Court does not yet have a full picture of Lockton Defendants' functional role, and allowing this case to proceed to discovery will clarify this issue. Lockton Defendants' argument that *Briscoe* was decided before *Iqbal* and its subsequent heightened pleading standard is unavailing. *Briscoe* was reviewing a motion for summary judgment, not a motion to dismiss. *Id.* at 482. Thus, determinations of fiduciary status are likely fact-intensive inquiries and should therefore not be decided at the outset. It is true that the Court must draw the inference that Lockton Defendants are a fiduciary in order to find Plaintiffs' allegations sufficient to state a claim, but this is a reasonable inference to draw in favor of the non-moving party in this situation. *Total Benefits Planning Agency, Inc.*, 552 F.3d at 434. Lockton Defendants' motion will therefore be denied.

C.    **Plaintiffs' Motion for Leave to File Sur-Reply (DN 54)**

Finally, Plaintiffs' have moved to leave to file a sur-reply to Defendants' Motion to Dismiss the Amended Complaint. (Pls.' Mot. Leave File Sur-Reply 1, DN 54). Neither the Federal Rules of Civil Procedure nor the Court's local rules permit the filing of sur-replies. "As many courts have noted, '[s]ur-replies . . . are highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter.'" *Liberty Legal Found. v. Nat'l Democratic*

*Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (citation omitted).  Because sur-replies are highly disfavored and it is unnecessary for the Court to consider the tendered sur-reply in ruling on the pending dispositive motions, this motion will be denied.

## V.    CONCLUSION

For the reasons stated, **IT IS HEREBY ORDERED** as follows that:

1.    Defendants' Motion to Dismiss (DN 19) is **DENIED AS MOOT**.

2.    Defendants' Motions to Dismiss (DN 31, 32) are **GRANTED IN PART** and **DENIED IN PART**.  Count II is dismissed only with respect to the duty of loyalty claim.  Counts I, III, IV, V, VI, and VII remain.

3.    Plaintiffs' Motion for Leave to File Sur-Reply (DN 54) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

August 2, 2019

cc:    counsel of record